Good morning, Your Honor. Stuart Estner appearing on behalf of Appellants Donald and Tina Hulett. As the Court knows, this case involves the service mark Concerts West, which as the District Court recognized, was used by Tom Hulett from the 60s through the early 90s to promote concerts. The District Court concluded that, as a matter of law, that mark was abandoned before, three years before the defendants or the appellees registered the mark as their own. Let me ask a question that directly relates to that. My understanding is that you claim that the late Tom Hulett used the service mark after 1992. Is that correct? Correct, Your Honor. What proof did you offer below as to that? Your Honor, we offered several pieces of evidence on that point. Initially, we could point to the fact that during the period prior to his death, Tom Hulett was operating solely as Tom Hulett and Associates. It was during that time that the Moody v. The mark we're talking about is Concerts West? Yes, Your Honor. Okay. So just as a little bit of a backdrop to get into why it was used during that period, it was during that period while Tom Hulett and Associates, that the Moody Blues Tour was promoted and started. That Moody Blues Tour, we have evidence, was promoted using the Concert West mark. Specifically, the declaration of Donald Hulett at Excerpt of Record 1258, since, well, it says, Since my father's death in 1993, I used the service mark Concert West at Tom Hulett and Associates to assist in promoting and managing the Moody Blues Tours. I think my question asked, when did Tom pass away? July of 1993. I think my question related to his use of the mark after 1992. And we have Judith Wilson, who worked at Tom's office from May of 1992 to May of 1993 at Tom Hulett and Associates, testifying that during this time, Concert West received money from the Moody Blues Tour, which was deposited into a bank account labeled Concert West, and that's at Excerpt of Record 575. So that was prior to Mr. Hulett's death. Can I ask you a question? How is it that your clients have ownership of this mark? You argue that you got it through a family trust? That's one theory, yes, Your Honor. Well, you've got three theories, right? Well, this morning I was going to discuss two of them, but I believe three were posited. You've got three theories, and they seem to conflict, don't they? And how did the mark get into the trust? Well, the mark, I'm sorry. Let me ask you, did the father own the mark? Was it owned by one of the corporations that the father owned shares of? I mean, there's no document that puts this mark into a trust, is there? Well, I'm not aware of a document that does that, Your Honor. So how did it get into the trust? The way it got into the trust is, again, backing up. Mr. Hewlett used this mark from the 60s through the early 90s. He then died. Never registered it. Never registered it. He died while operating Tom Hewlett & Associates, Inc., which used the mark. So who owned the mark then, Tom Hewlett & Associates? Tom Hewlett & Associates, Inc. used the mark and owned the mark at that point prior to Tom's death. I believe that was 100 percent owned by Tom Hewlett and his wife. And that was the corporation transferred the mark to the trust? The corporation was transferred into the trust. And it's undisputed that TH&A Tom Hewlett & Associates became part of the trust. At that point, Mr. McKenzie explains that he considered Tom Hewlett & Associates no longer a viable entity after Mr. Hewlett died because it was of such a personal nature to Mr. Hewlett. So Mr. McKenzie, defendant of Peli in this case, testified in deposition that it was his decision to continue to operate those ventures that were operated by Tom Hewlett & Associates through the trust itself. He testified that the assets that he considered to be part of Tom Hewlett & Associates were then made part of the trust. And, in fact, he wrote a letter to the Moody Blues tour organizer that the funds from that tour should now be paid directly to the trust. Who owns the mark now, the trust? Well, as an asset of Tom Hewlett & Associates, which was dispersed into the trust, the trust became the owner and user of that mark because that Moody Blues tour promoted under the mark, under the Concert West mark, continued for some time after that and, in fact, generated $115,000 worth of dividend royalties or payments, excuse me, to the trust as of January 31, 1995, and that's that excerpt of Record 1402. Is the trust a party to this action? The trust is no longer existing. It was distributed to the appellants in this case. So the assets of the trust then got distributed to the appellants in this case, and that's why appellants have standing to bring the claim. When that distribution took place, was the mark referred to? Not initially, and the district court focused on the fact that it was not initially referred to, but we've got testimony from three individuals who testified that after that initial distribution or initial category or schedule of assets, the mark was specifically referred to by Mr. McKenzie as having been part of the trust. That's Don Hewlett, Tina Hewlett, and Patrick Lang, each declared that after that point, Mr. McKenzie did say that the mark was an asset of the trust. If you look at Tina Hewlett's declaration at Excerpt of Record 1194, in early 1996, Mr. McKenzie provided a revised list of assets owned by the Hewlett Family Trust, which included Concerts West. So we have at least a question of fact whether or not the mark was part of the trust, ultimately distributed to the individuals. And for abandonment, which, of course, is strictly construed, there's a strict construction against abandonment, there's two things necessary, a nonuse for a period of three years and an intent not to use the mark. So we have the mark being used. But when you started out, you said you thought that the mark belonged to CWI and then became a trust asset, and then Tom transferred CWI to the trust. But is there any evidence that CWI was a trust asset? There is evidence that CWI was a trust asset in the form of Exhibit 7, which specifically lists CWI. It's a schedule of assets that the district court concluded was apparently part of the original bankruptcy schedule by Tom, by the Hewlett parents. Why wouldn't CWI be the appropriate entity to sue? Well, but CWI, again, there was an amended interrogatory response. Initially, the Hewletts responded that the chain of title went through CWI. But CWI was dissolved. CWI was dissolved. And then it abandoned any claim that it had. Well, then it abandoned any claim that it had. Then there was an amended interrogatory response three days after the deposition of Mr. McKenzie, where he described the fact that it was HLNA, that Tom Hewlett and Associates ended up in the trust, and the Hootie Blues. After the defendants filed their motion for summary judgment, then the plaintiffs amended the interrogatories, arguing the CWI transferred the mark to the THA, right? Correct, Your Honor. And the district court concluded as one of the reasons why summary was improper to amend interrogatories merely to defeat summary judgment. Correct, Your Honor. And that, but the emphasis, I believe, should be on the word merely and whether or not this was a sham amendment. This was not a, by any measure, a sham amendment simply to defeat interrogatories simply to defeat summary judgment. It was an amendment that was made three days after a deposition by one of the defendants who was in the ---- But Tom Hewlett and Associates, okay, argument is at one time owned the mark, but they can't sue because they were suspended in 94, and then this, and then it abandoned its claim. Well, that actually furthers our argument rather than defeats it, Your Honor, because the fact that it ceased existing, Tom Hewlett and Associates ceased existing after it became, after it went into the trust and after Defendant McKenzie decided it was no longer a viable entity to operate the business, so he let it languish. It was Defendant McKenzie's watch. That asset, that corporation no longer existed. And it was the trust at that point that operated the business. We know for a fact that business continued. We know that the Moody-Plews tour continued. We know that income was generated. Did the corporation transfer the mark to the trust? The corporation, I think ---- THA. I'm sorry. THNA transferred the mark to the trust. It was dissolved. It was effectively disbanded, dissolved, while as part of the trust, its assets distributed to the trust, and because the mark was one of its assets, that mark became an asset. Did Tom ever own the mark? He did own the mark, yes. But then he filed for bankruptcy. He said he didn't own any trademarks.  Do you believe that schedules list a trademark as an asset? I believe so. But even if that ---- Do you believe they did? I'm sorry. Do you believe that bankruptcy filings ---- this would have been in 1993 when Tom and Charlene filed for bankruptcy, that the bankruptcy statement of assets listed the mark? No. I'm sorry. No, I do not believe that, Your Honor. It's just the opposite, isn't it? It does not list them. The bankruptcy schedules, I believe, do not specifically ---- In fact, didn't they make an affirmative statement in those schedules that they owned no trademarks? I believe so, Your Honor. Honestly, I'd have to look back at the schedules. That sounds correct, though. But even if that's ---- That was in 1993. Tom died, if I take it, later in 1993. Charlene died in 1995. And sometime in 1995, Tina asked McKenzie to terminate the trust. Do I have that right? I believe so, Your Honor. And Tina's list of trust assets does not include this mark? Correct. All that's correct. The fact, however, is the mark was being used. Income was being generated through the use of the mark with the Moody Blues tour. That income went into the trust. There were revised lists of assets to that trust, specifically listing Concerts West. We're here on summary judgment. Are there triable issues of fact that, in fact, Concerts West was a mark used by the trust, no matter how it got it, because at that point the mark was not registered? So if it didn't get it from TH&A, it had it, it was using it, it was generating income, it became the trust's mark. The trust generated income from that mark, and it was Tina and Don Donald that ultimately received the assets from that trust. So the fact that Tina's initial schedule may not have listed the trust doesn't necessarily, as a matter of law, negate the fact that there's three declarations saying that after that initial schedule, Defendant McKenzie specifically said that Concerts West was a asset, the mark was an asset of the trust. At least there's a triable issue of fact at that point with respect to whether that mark was an asset of the trust. And that's the first reason why the summary judgment should be reversed. A second reason why the summary. Let me ask you this. On the fees, Don and McKenzie entered into a settlement agreement, and the district court held Don responsible for McKenzie's fees. Is that right? Yes. Okay. But did the court consider that there were four defendants involved? You know, it's unclear to me exactly what the process by which the court calculated the fees are, and whether it considered whether that certain of the claims were being prosecuted by Tina, who was not, Tina Hewlett, who was not a signatory to the release under which the fees were awarded. And that's, I think, set out in our briefs, that we believe that the district court abused discretion in calculating fees to impose fees on Donald that did not correspond to the claims Mr. McKenzie was required to defend against him, nor require Mr. McKenzie to establish that he actually was. What do you think? Do you think those fees should have been shared among the four defendants? Your position. Well, only defendant McKenzie had a fee clause. Yeah. So, yes, it should have been reduced further down to correspond more accurately with the claims that were being prosecuted by Mr. McKenzie to Donald Hewlett. The fee award arose out of, do I understand correctly, arose out of the breach of an agreement between Don and McKenzie? Yes. A release. And did that release document involve any other Hewlett? No. I believe that Don was the signatory. It was just Don and McKenzie, right? Correct. Okay. And as well, it's our position that that would be. Did Tina or any of the other Hewlett children have anything to do with the breach of that release? No. Tina is the only other Hewlett child, and she was not a signatory to that release. And had nothing to do with its breach? Well, as not a party, she was entitled, it was a release agreement, and so she had no, there was no arguable prescription on her bringing suit in violation of a release she never signed. I'm not sure that answers your question. Well, the fee award resulted from the apparent breach of this document that was between McKenzie, the trustee, and Don Hewlett, right? Yes. That release did not involve Tina in any way. Yes. And as far as the record shows, Tina had nothing to do with the events that led to McKenzie alleging that the release had been breached. Yes. Okay. That's all I wanted to find. Sorry, Your Honor. Thank you. Okay. And finally, Your Honor, just on the second theory why there's questions of fact, even if even if. Do you want to save some time? Well, I would, but I'd like to just get this out on the table. Even if the trust did not have the mark as an asset, after the trust was dissolved, Tina and Donald used the mark on their own to promote concerts and therefore and to promote events. And therefore, they became the common law owner of the mark, regardless of whether their fathers had it at some point, THNA had it at some point, or any of his corporations had it. That mark was unregistered and became owned by Donald and Tina at that point through their own individual use of the mark. And these questions of fact exist whether that ownership interest was sufficient to overcome a claim of abandonment prior to the registration by the appellees. And with that, I'd reserve my remaining time. Thank you, Your Honor. Good morning, Your Honor. Kathy Jory with Luce Forward. I'm here also with Jeffrey Wexler of Luce Forward on behalf of the respondents. I'm going to jump right into some of the questions Your Honor asked. In this case, the first interrogatory response and the amended interrogatory response presented by the Hewletts, admitted that Concerts West, Inc. was the corporation which owned the mark in the 1980s. Second amended. That's the entity that's referred to as CWI. Yes, Your Honor. Concerts West, Inc. It was a company that was ultimately owned 50 percent by Tom Hewlett and 50 percent by Jerry Weintraub. And that corporation was dissolved in 89? Yes, Your Honor. Administratively dissolved by the State of Washington in 1989. And that State had a law at that time that required reinstatement within two years. Also, the law of that State indicated that that company could not conduct business other than to wind up its affairs. If you look at the ---- And is there any proof CWI did any business after that? There's not any. Well, there is a tax return that was filed by CWI. And, of course, we have the statement made under penalty of perjury by Tom Hewlett on June 3, 1993 in connection with his petition that CWI ceased to do business on December 31, 1992. So I think there's an inference that it continued to have some form of activity through December 31, 1992. Contrary to counsel's characterization, however, there's nothing in the record that shows that Tom Hewlett himself used the Concerts West mark after December 31, 1992, or that Tom Hewlett and Associates used the mark Concerts West. Nothing. Is there some reference in the opening argument to a Moody Blues concert and some money that flowed back from that? Yes, Your Honor. The money that flowed ---- the evidence shows the monies that flowed from Moody Blues went to a division of the trust that Mr. McKinsey had set up called Tom Hewlett and Associates. There's no evidence that ---- there is a deposition from Eddie Winrick that is cited in the appellant's papers where Mr. Winrick said that if Tom Hewlett were to buy a Moody Blues concert in 1993, he would have done it through Concerts West. That's really the only connection to Concerts West. I thought I heard your opponent argue that some money actually went into an account called Concerts West. There's no evidence that the monies went into the account called Concerts West that I'm aware of in the record during 1993. Or at any other time? There might be evidence prior to 1993. I meant after that. Correct. On or after that. No time after December 31, 1992. I recall no evidence of that. So we've got a corporation that apparently owned the market dissolves. It doesn't reinstate. The affidavit from Tom saying that it did no business beginning January 1, 1993, right? Correct. And then also the affidavit. And in 1993, Tom and Charlene filed for bankruptcy. They affirmatively state they own no marks. Yes, they do. Am I right so far? Correct. Tom dies in 1993. In July of 1993. Charlene dies in 1995. That is correct. And at some point in 1995, Tina instructs the trustee to dissolve the trust. Yes. And states affirmatively that the assets don't include any mark. That is correct. Here, the Hewlett's attempted to avoid the impact of Concerts West Inc. going out of business by amending their interrogatory responses and claiming that Tom Hewlett and Associates, other company, suddenly owned the mark. Now, your client did acquire the mark or knowledge of the name, if you will, from some former employees of Tom's. Is that right? Yes. The former employees, Paul Gongaware and John Meglin, had previously worked for one of the predecessor companies under Tom Hewlett many years before. So they were familiar with the name and the reputation that it had in the entertainment industry. Absolutely. And they began using the name Concerts West. Yes. They commenced their use of the name Concerts West in 1998, nine years after the dissolution of Concerts West Inc. And the suggestion that Tom Hewlett owned the mark, I mean, obviously the bankruptcy petition says he didn't own an intellectual property right, but that's key because the laws would require him to disclose any ownership of the mark in the trust as well in his bankruptcy petition. And he failed to do that, which indicates under penalty of perjury that he did not, and nor did the trust own the mark. There has been a suggestion that three declarants indicated that Bill McKinsey told them that the Concerts West mark was somehow in the trust. The evidence has been mischaracterized to you. In fact, Tina Hewlett and Don Hewlett claimed in their declarations that Bill McKinsey told them that the corporation, Concerts West Inc., had been transferred to the trust. Now, we have no evidence that really occurred, but even if it did occur, the corporation was the owner of the mark. The corporation had gone out of business. McKinsey is a lawyer? No, he is not. He's not a lawyer. What is he? An accountant, tax advisor. Did he help Gongower and Meglin form Concerts West Limited? Yes, he did. He had known them from the earlier days with Concerts West Inc., and the services he rendered for them was he called and arranged for the company to be established, and he also provided them with tax services. He was not an employee, an officer, a director, or an owner of the new Concerts West Limited at any time. Was he paid a fee to do that? Yes, he was. He was paid $3,500. That's in the record in connection with the work he initially performed to assist them in setting up their whole accounting records. Did he have anything to do with the application to register the mark in California and with the PTO? No, Your Honor. No. The application was made by Concerts West Limited. The registration was granted in 1998 and 2000 by the California Secretary of State and the U.S. PTO, and of course creates a prima facie case that Concerts West Limited, the entity owned by Mr. Meglin and Mr. Gongaware, owned the mark. So just to go back, we submitted undisputed evidence from Jerry Weintraub, who was a 50 percent owner of Concerts West Inc., that Concerts West Inc. never transferred the mark, never sold the mark to anybody, and that he ceased his own activities in Concerts West Inc. in the 1980s. So there's no evidence to contradict that other than pure supposition that somehow the mark went from Concerts West Inc. to Tom Hewlett & Associates. But even if it did, at most, there's stock of a corporation in a trust, and that corporation also was suspended in 1994. The suggestion that Mr. McKenzie, as the trustee of the family trust, had some obligation to use trust assets in order to carry on the businesses of Concerts West Inc. or Tom Hewlett & Associates would suggest that he needs to go back and somehow change the law in Washington so he can reinstate Concerts West Inc., which had long since been dissolved. And also that he should use what little assets were left to run businesses when the person who was the business was no longer around. In any event, the time in which the Hewlett's should have discovered that Mr. McKenzie was not doing that was pretty quickly after he took over as the trustee, and at a minimum by the time he sued them in Washington in 1998. Either way, if you run the statute of limitations from the time he submitted his final accounting in December of 1995, or you run it from the time in which he filed the lawsuit against the Hewlett's, either way, any claim they have against him for breach of fiduciary duty was time barred. Anything else? Just to address the final point made by counsel here, well, two points. One has to do with the use by Donald and Tina Hewlett. We've submitted evidence that Tina Hewlett testified that she never operated a business under the Concerts West name. We submitted evidence that Donnie Hewlett testified that while he said he ran a business called Concerts West, he didn't have any of the activities that one would expect when you run a business. He testified that he didn't have a business address, he didn't have a bank account, he never made money, he didn't advertise. He just, anything you would imagine, didn't know tax filings with the State. He didn't know administrative filings with the State. He said that while he thought he wrote from five to ten letters in 1995 to 1996, the majority of them went to Bill McKenzie, and maybe two of them went to a Marie Cooper. The type of use that has been presented now in the declarations of Tina and Donnie Hewlett do not establish a bona fide use. The point they're trying to make is, okay, maybe they didn't get the name through the trust, but they started using it before Concerts West Limited started using it in 1998. They have to come in with more than just their self-serving conclusory declarations that say they used the mark Concerts West in some completely undefined way. They have no statement that they used it as a source identifier. They have no statement that they used the name in the sale or advertisement of a service. And they have no evidence that they performed any service whatsoever. And on top of that, they have not one piece of paper, not one invoice, not one advertisement, not one business card, not one contract. They have absolutely nothing produced in discovery or presented to the underlying court or to Your Honors that would corroborate their statement that they have, indeed, used this mark in a bona fide way. That is simply insufficient to overcome the undisputed evidence that we have presented that they did not use the mark and that the first ones to use the mark after the mark was abandoned by Concerts West Inc. was Concerts West Limited in 1998, and they have a prima facie proof of that because they were the registered owner of the mark. As to the attorney's fees, just to respond briefly, the release was a release between Donald Hewlett and Bill McKenzie where Donald Hewlett released Bill McKenzie in February of 1999. Do you have a dog in this fight? I don't. If Your Honors have no questions of me, I would be happy. No, no. I meant in this particular dispute between McKenzie and Don Hewlett. You don't have a dog in that fight, do you? I do, actually. I represent Mr. McKenzie. And the only dog I have is that I think that the lower court, if anything, should have granted more fees, but that's not before Your Honors. And if you have any questions about the fees that were granted, I'd be happy to answer them. Thank you very much. There is evidence that Concerts West was used in connection with the Moody Blues tour. Again, the deposition of Judy Wilson. And you testified earlier that you believe that Concerts West received money in connection with the Moody Blues tours. Uh-huh. Rock on Tours. From Rock on Tours, which was the Moody Blues business arm. Yes. That's at Excerpt of Record 575. There's the schedule of tours sent regarding the Moody Blues tours sent to Don Hewlett at Concerts West. Excerpt of Record 1454. There's the June 17, 1993 royalty statement sent to Don Hewlett at Concerts West. Excerpt of Record 1459. There's the declaration of Donald Hewlett. Again, that specifically says, while that at time, I used the service from our Concert West at Tom Hewlett and Associates to assist in promoting and managing the Moody Blues tours. Excerpt of Record 1258. Appellee may not like the declarations of appellants, may disbelieve them, but it does not negate that they are sufficient to create triable issues of fact. The bankruptcy petition, the failure to list the asset, at most, that would create a triable issue of fact. It doesn't negate, as a matter of law, that any asset left off that petition means that it does not exist. If there's a judicial estoppel claim, it hasn't been made here. Tina, there's no evidence, a claim of misrepresentation that the declarant said that Concerts West, that Mr. McKenzie said Concerts West was part of the trust. Tina Hewlett at Excerpt of Record 1194. In early 1996, Mr. McKenzie provided a revised list of assets owned by the Hewlett Trust, which included Concerts West, period. That's evidence Mr. McKenzie told her after the original schedule that Concerts West was part of the trust, and I recognize I'm out of time.
judges: Pregerson, Hall, Hawkins